IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PERPETUA U. EZEH,                    :

    Plaintiff,                   :

v.                                   :

BIO-MEDICAL APPLICATIONS OF    :   Civil Action No. GLR-11-3441
MARYLAND, INC. d/b/a
FRESENIUS MEDICAL CARE OF       :
PORTER DIALYSIS – ROSEDALE,

                       :

    Defendant.                   :

                       :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Bio-Medical Applications of Maryland, d/b/a Fresenius Medical Care of Porter Dialysis – Rosedale's ("FMC") Motion to Dismiss or, in the alternative, for Summary Judgment ("Motion"). (ECF No. 18). Plaintiff Perpetua U. Ezeh ("Ezeh") alleges termination on the basis of race and national origin (Count I), termination on the basis of reprisal (Count II), and wrongful termination in violation of public policy under Maryland common law (Count III). FMC seeks dismissal or, in the alternative, summary judgment on Counts II and III of Ezeh's Complaint. The issues have been comprehensively briefed, therefore, no oral argument is necessary. See Local Rule 105.6 (D.Md. 2011). For the reasons that follow, FMC's Motion is granted in part and denied in part.

## I.   BACKGROUND[1]

Ezeh, an African-American woman of Nigerian national origin, began working for FMC on or about October 20, 2008, as a Clinical Manager in FMC's Rosedale Clinic. FMC operates kidney dialysis centers and provides dialysis treatment. In her capacity as Clinical Manager, Ezeh supervised two full-time nurses; Sue Barton ("Barton") and Ahman Calilung. Carol Miller ("Miller"), Director of Operations, was Ezeh's second-line supervisor and her first-line supervisor was Area Manager, Markswell Nwachinemere ("Nwachinemere").

Miller is Caucasian and Nwachinemere is of African descent. According to Ezeh, Miller held a bias against African-Americans, particularly those originating from African nations, and explicitly expressed her bias by allegedly stating "the Africans have to go," complaining that Nwachinemere was "dumb," and characterizing Ezeh's work presentation as "very animated." Miller allegedly sought to remove African subordinates from FMC by treating non-African employees favorably and discriminatorily instituting disciplinary actions.

## A.   Rosedale Clinic Water System Crisis

Ezeh's first allegation of wrongful conduct arose on January 29, 2009. That day, the water system malfunctioned at

---

[1] Unless otherwise noted, the following facts are taken from the Complaint and are viewed in a light most favorable to Ezeh.

the Rosedale Clinic.  As a result of this problem, patients could not receive their dialysis treatment at that location. During the malfunction, Ezeh was out of the office pursuant to orders from her dentist regarding a tooth ache.

On that day, Barton called and spoke with Ezeh several times to receive instruction regarding patient rescheduling and transfers.  On the third call, Barton requested that Ezeh come to the clinic, but Ezeh refused.  Barton then complained to Miller that Ezeh failed to manage the water system crisis. Subsequent to Barton's complaint, Nwachinemere contacted Ezeh and requested that she return to the clinic and oversee the patient rescheduling and transfers.  After the crisis resolved, and allegedly upon Miller's insistence, Nwachinemere issued Ezeh a written reprimand regarding her failure to effectively manage the clinic during the crisis. (<u>See</u> Def.'s Mot. Ex. 1, ECF No. 18-2).

**B.   <u>Complaints Regarding Barton's Performance and Alleged Improper Administration of Prescription Drugs</u>**

Ezeh next alleges that in May 2009, Barton, who allegedly has a history of drug addiction, complained of nausea and requested a dose of the drug Phenergan, a habit-forming prescription drug, from the Clinic's Medical Director Dr. Al Talib ("Talib").  Talib agreed to the request, but Barton asked

an unqualified technician to administer the intramuscular injection.

Ezeh also alleges that, while she was away at a clinical managers meeting, clinic staff complained that Barton slept on duty, thereby leaving patients unattended. As a result, Ezeh called another nurse to finish Barton's shift.

The next day, Barton allegedly asked an unauthorized technician to inject her with Phenergan and fell asleep on duty again. This time Barton did not acquire a physician's permission. Ezeh reported Barton to the Maryland Board of Nursing, issued a written reprimand, and notified Miller of Barton's conduct.

On or about June 4, 2009, Miller allegedly confronted Ezeh about reporting Barton's conduct to authorities. Miller allegedly told Ezeh that she could not reprimand employees without Miller's permission; a restriction Miller did not impose on non-African clinical managers. In the summer of 2009, Barton allegedly refused to fulfill her duties or complete required training. When Ezeh sought permission from Miller to reprimand Barton, Miller refused her request.

**C.   Failure to Address Staffing Shortages**

Ezeh also alleges Miller scheduled insufficient staff for shifts supervised by African clinical managers, including Ezeh, thereby forcing them to perform tasks beyond their managerial

4

duties.   Specifically, in or about September 2009, FMC allegedly failed to maintain an adequate labor pool for its clinics and prohibited clinic managers from seeking assistance from staffing agencies without approval from the Regional Vice President.   For example, on September 7, Ezeh filled a serious staffing shortage at the clinic without the assistance of her supervisors.   Again, on September 10, Ezeh sent an e-mail to FMC's employees seeking assistance for a September 11 staffing shortage, which included a request for two technicians.   A manager at another clinic agreed to transfer one nurse to Ezeh's location.   That nurse, however, had been previously designated by Miller to work at the Pikesville location.   Ezeh attempted to change Miller's mind, but Miller was unresponsive.   (See Def.'s Mot. Ex. 2, ECF No. 18-3).   Ezeh then contacted Talib who ensured the nurse would work with Ezeh.   Miller thereafter informed the Pikesville manager of the new arrangement.   She failed, however, to address Ezeh's request for technicians.   This required Ezeh and one nurse to monitor five patients.

**D.   Wrongful Discharge**

On September 14, 2009, Ezeh sent an e-mail to Regional Vice President Gary Booth ("Booth") and Regional Quality Manager Susan Wilson ("Wilson") disclosing Barton's alleged drug use, patient neglect, and refusal to attend training; the September 10 staffing shortage; and her conflict with Miller.   (Def.'s

Mot. Ex. 3, ECF No. 18-4).  In closing, Ezeh expressed confusion over "such treatment" and her need to "find peace and justice for what is right and wrong."  (Id.).

On September 15, 2009, during the clinic's monthly quality indicator meeting, Ezeh attempted to raise the issues identified in the September 14 e-mail.  Ezeh alleges Miller refused to address the issues.  This inaction upset Ezeh and caused her prolapsed mitral valve to become aggravated.  According to Ezeh, she left the meeting, took prescription medication to abate her symptoms, and met with her physician who prescribed a two-day regimen of a mild tranquilizer.  Ezeh's physician also ordered her to take off a few days to recover.

Upon her return to the clinic on September 17, Ezeh met with Miller and Nwachinemere.  At that time, Miller informed Ezeh that her verbal resignation from the previous week was accepted.  Over Ezeh's protest that she did not resign, Miller terminated her employment.  (See Def.'s Mot. Ex. 5, ECF No. 18-6).  According to Ezeh, Miller's refusal to allow Ezeh to remain employed with FMC contravenes Miller's previous rescission of a Caucasian technician's written resignation.

On October 2, 2009, Ezeh filed a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC").  The EEOC issued a Dismissal and Notice of Right to Sue on August 31, 2011.  Ezeh commenced this action against FMC on November 29,

2011, and filed an Amended Complaint on January 9, 2012.  FMC filed the pending Motion on March 12, 2012.  Ezeh opposes the Motion.

## II.  STANDARD OF REVIEW[2]

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Presley v. City of Charlottesville, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead plausible, not merely conceivable, facts in support of her claim.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The complaint must state "more than labels and conclusions, and a formulaic recitation of the elements of a

---

[2] When matters outside the pleadings are presented to and not excluded by the Court, a Rule 12(b)(6) motion must be treated as one for summary judgment under Rule 56.  Fed.R.Civ.P. 12(d).  In this District, however, "an exception to the general rule is made for documents which are referred to in the Complaint and upon which Plaintiff relies in bringing the action."  White v. Mortgage Dynamics, Inc., 528 F.Supp.2d 576, 579 (D.Md. 2007)(citations omitted).  In such cases, the documents appended to defendant's motion to dismiss do not convert the motion into one for summary judgment.  Each of FMC's exhibits, with the exception of Exhibit 4, are referenced in the Complaint and relied upon by Ezeh.  Moreover, the Court does not rely upon Exhibit 4 in making its ruling.  Therefore, FMC's Motion is not converted into one for summary judgment.

cause of action will not do." Id. at 1965. The court must,
however, "assume the veracity [of well-pleaded factual
allegations] and then determine whether they plausibly give rise
to an entitlement of relief." Ashcroft v. Iqbal, 556 U.S. 662,
679 (2009).

### III. DISCUSSION

#### A.   Title VII – Termination on the Basis of Reprisal (Count II)

The Court denies, without prejudice, FMC's Motion as to
Count II because, at this juncture, Ezeh has sufficiently pled a
Title VII retaliation claim.

Title VII of the Civil Rights Act of 1964, as amended,
prohibits an employer from "discriminat[ing] against any of
[its] employees . . . because [the employee] opposed any
practice made an unlawful employment practice by this subchapter
. . . ." 42 U.S.C. § 2000e-3(a). The initial burden is on Ezeh
to establish a prima facie case of retaliation under Title VII.
E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 405 (4th Cir.
2005). To establish a prima facie case of retaliation, Ezeh
must prove (1) she engaged in a protected activity, (2) FMC took
an adverse employment action against her, and (3) the adverse
employment action was causally connected to Ezeh's protected
activity. Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th
Cir. 2007).

FMC argues that Ezeh's claim should be dismissed because she failed to allege two elements: (1) that she engaged in a protected activity; and (2) that a causal connection existed between her termination and the alleged protected activity. (Def.'s Mem. Supp. Mot. 7-10). Specifically, FMC contends Ezeh did not engage in a protected activity because the e-mails upon which she rely fail to assert discriminatory treatment. (Id.). According to FMC, Ezeh was terminated due to her managerial ineffectiveness. (Id.).

Ezeh avers that the absence of "magic" discriminatory words in her e-mails should not preclude her from circumventing FMC's Motion because she clearly disclosed Miller's alleged discriminatory practices. (Pl.'s Mem. Opp'n to Def.'s Mot. 8-10). Moreover, Ezeh avers that discovery will produce evidence that her e-mails are responses to "verbal complaints she made expressly in opposition to racist and discriminatory conduct." (Id. at 10-11). Ezeh also avers she's pled the temporal proximity, animus, and adverse action necessary to establish a causal connection between her protected activity and subsequent termination. (Id. at 11-13). Assuming Ezeh's allegations are true, the Court finds it premature to dispose of Count II.

The two e-mails, referenced by both parties, are dated September 10, 2009, and September 14, 2009, respectively. (See Def.'s Mot. Exs. 2-3). Both e-mails describe the tension between

Ezeh and Miller without an explicit reference to discrimination. The September 14 e-mail, however, references Ezeh's confusion over "such treatment" and the assertion that the e-mail is her "last resort to find peace and justice for what is right and wrong." (Id. Ex. 3, at 2). Moreover, the timing of Ezeh's termination in relation to her complaints is close enough to establish a causal connection through temporal proximity. Whether Ezeh's e-mails are, as she alleges, a response to prior verbal complaints of discriminatory conduct may be revealed at the conclusion of discovery.

Accordingly, FMC's Motion is denied without prejudice as to Count II.

**B.** **Wrongful Termination in Violation of Public Policy under Maryland Common Law (Count III)**

The Court grants FMC's Motion as to Count III because a statutory remedy exists for Ezeh's claim.

Relying upon the seminal case of Makovi v. Sherwin-Williams Co., 561 A.2d 179 (Md. 1989), FMC argues that this count should be dismissed because the Health Care Worker Whistleblower Protection Act ("WPA")[3] provides a remedy, thereby removing Count

---

[3] The WPA provides in part that "an employer may not take or refuse to take any personnel action as reprisal against an employee because the employee: (1) Discloses or threatens to disclose to a supervisor or board an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation . . . ." Md. Code Ann., Health Occ. § 1-502(1). Moreover, any employee subject to a retaliatory personnel action

III from the purview of this tort claim.[4] (Def.'s Mem. Supp. Mot.
12-15). FMC argues in the alternative that even if a statutory
remedy were not available, Ezeh failed to articulate a basis for
the alleged violation of a clear mandate of public policy. (Id.
at 13).

Ezeh counters that her wrongful discharge claim is not
based upon the WPA, but a codified code of ethics (Maryland Code
of Regulations ["COMAR"] sections 10.27.09.03 and 10.27.19.02)[5]
that require her to act as a patient advocate by reporting
unlawful conduct.[6]  (Pl.'s Mem. Opp'n to Def.'s Mot. 18-21).
Moreover, Ezeh argues that the Court of Appeals of Maryland
permits wrongful discharge tort actions to be filed in tandem
with whistleblower actions "if the employer's unlawful actions
reach beyond the scope of the whistleblower protections." (Id.

---

may file a civil action within one year after the violation, or
within one year after the employee first became aware of the
alleged violation. § 1-504.

[4] FMC also argues this claim should be dismissed because
Ezeh resigned and therefore was not terminated.  The Court will
not address this argument, however, because this count will be
dismissed on another ground.

[5] The ethics portions of these sections state, in part, that
a nurse shall "[a]ct to safeguard a client and the public if
health care and safety are affected by the incompetent,
unethical, or illegal practice of any person . . . ." Md. Code
Regs. 10.27.19.02(A)(3) and "[a]ct as a client advocate and
assist clients to advocate for themselves . . . ." Md. Code
Regs. 10.27.09.03(E)(2)(c).

[6] Ezeh also asserts a second public policy argument against
working in an under-staffed clinic in violation of Maryland
regulations.  Ezeh's Opposition, however, primarily focuses on
her obligation to report Barton's illegal conduct.

at 20-21).   In support of her argument Ezeh relies upon <u>Insignia Residential Corp. v. Ashton</u>, 755 A.2d 1080 (Md. 2000), and <u>Lark v. Montgomery Hospice, Inc.</u>, 994 A.2d 968 (Md. 2007).

In Maryland, an at-will employee may be discharged at any time unless "the motivation for the discharge contravenes some clear mandate of public policy." <u>Adler v. Am. Standard Corp.</u>, 432 A.2d 464, 473 (Md. 1981).   In such cases, the terminated employee may file a wrongful discharge claim, but such claims are "inherently limited to remedying only those discharges in violation of a clear mandate of public policy which otherwise would not be vindicated by a civil remedy." <u>Makovi</u>, 561 A.2d at 180.   Moreover, "there must be a preexisting, unambiguous, and particularized pronouncement, by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make Maryland public policy on that topic not a matter of conjecture or even interpretation." <u>King v. Marriott Int'l, Inc.</u>, 866 A.2d 895, 903 (Md.Ct.Spec.App. 2005)(citation omitted).   The clear mandate requirement ensures that the judiciary does not assume the role of the legislature. <u>Id.</u>

Ezeh's wrongful discharge claim arises from her report of Barton's allegedly improper drug use and patient neglect to the Maryland Board of Nursing and FMC's management. (Compl. ¶¶ 102-11).   According to Ezeh, her statutory and regulatory duty to

act as a patient advocate and report Barton provides the clear mandate of public policy upon which she relies for her wrongful discharge claim. (Pl.'s Mem. Opp'n to Def.'s Mot. 19-20). As a preliminary matter, Ezeh's reliance upon Lark is misplaced because Lark primarily consists of a statutory interpretation of the WPA. Moreover, the Lark plaintiff relies upon the WPA to provide its clear mandate of public policy and Ezeh does not. Ezeh's reliance upon Insignia, however, and FMC's reliance upon Makovi are more applicable.

The court in Makovi clearly held that wrongful discharge actions may not stand when the public policy in question is codified in a statute that provides its own civil remedy. 561 A.2d 179. Insignia clarifies the Makovi rule and supports Ezeh's assertion that when multiple public policies are present, a wrongful discharge action may lie upon the policy that does not have a statutory remedy. 755 A.2d at 1081, 1087. The Insignia rule does not apply to Ezeh because she failed to allege a public policy independent from the one vindicated in the WPA.

The COMAR sections cited by Ezeh impose an ethical duty on nurses to act as client advocates, which, according to Ezeh, includes a legal obligation to report improper prescription drug use and patient neglect to management and the Maryland Board of Nursing. The clear mandate of public policy alleged here is,

13

therefore, the ability of a nurse to freely fulfill her legal obligation to report unethical activity without subjection to retaliatory termination by her employer. This policy, and the subsequent civil remedy, is codified in the WPA, which states an employer may not retaliate against an employee simply because the employee "[d]iscloses . . . to a supervisor or board an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation . . . ." Md. Code Ann., Health Occ. § 1-502(1). Ezeh's reliance upon the public policy in COMAR is unlike Insignia because that plaintiff identified the public policy against prostitution, which was separate and apart from the sexual harassment prohibition codified in Title VII. 755 A.2d at 1080-81, 1086-87. This differs from the Makovi plaintiff who solely identified the public policy against sexual discrimination remedied by Title VII. See Insignia, 755 A.2d at 1084. Similar to the Makovi plaintiff, Ezeh failed to identify a public policy that is not already protected by the WPA. Her wrongful discharge claim must, therefore, be dismissed.

Accordingly, FMC's Motion is granted as to Count III.

**IV.   CONCLUSION**

For the foregoing reasons, the Court will, by separate Order, DENY without prejudice FMC's Motion as to Count II and GRANT FMC's Motion as to Count III.  (ECF No. 18).

Entered this 8th day of August, 2012

                                          /s/
                             _____
                             George L. Russell, III
                             United States District Judge