IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PERPETUA U. EZEH,                    :

    Plaintiff,                   :

v.                                   :

BIO-MEDICAL APPLICATIONS OF          :   Civil Action No. GLR-11-3441
MARYLAND, INC. d/b/a
FRESENIUS MEDICAL CARE OF            :
PORTER DIALYSIS – ROSEDALE,
                                     :
    Defendant.                   :

                                     :


**<u>MEMORANDUM OPINION</u>**

Plaintiff Perpetua U. Ezeh ("Ezeh") commenced this action
under Title VII of the Civil Rights Act of 1964, as amended, 42
U.S.C. §§ 2000e <u>et seq.</u> (2012), alleging discrimination on the
basis of race and national origin (Count I), retaliation (Count
II), and wrongful termination in violation of public policy
under Maryland common law (Count III). The Court dismissed
Count III on August 8, 2012. (<u>See</u> ECF Nos. 34-35). Currently
pending before the Court is Defendant Bio-Medical Applications
of Maryland, d/b/a Fresenius Medical Care of Porter Dialysis –
Rosedale's ("FMC") Motion for Summary Judgment. (ECF No. 47).
The Court, having reviewed the pleadings and supporting
documents, finds no hearing necessary pursuant to Local Rule
105.6 (D.Md. 2011). FMC's Motion will be granted because Ezeh
failed to produce sufficient direct or circumstantial evidence

showing that discrimination was a motivating factor in her departure from FMC, and she failed to produce evidence of a causal link between her alleged protected activity and her departure.

## I.    BACKGROUND[1]

FMC operates 2,700 kidney dialysis clinics world-wide, including 27 in the State of Maryland. The clinics are staffed by Patient Care Technicians ("PCTs") and Registered Nurses supervised by a Medical Director and Clinical Manger ("CM"). The CM at each FMC clinic is also a registered nurse and is responsible for ensuring the care and safety of patients, hiring and firing staff, scheduling staff, maintaining an emergency plan for patient care, and responding to all emergencies.

On October 20, 2008, FMC employed Ezeh, an African-American woman of Nigerian national origin, as a CM in its Rosedale Clinic. Markswell Nwachinemere ("Max"), FMC Area Manager of Operations, hired Ezeh and became her immediate supervisor. In February 2009, FMC promoted Carol Miller ("Miller") to Director of Operations, which made Miller Ezeh's immediate supervisor in lieu of Max. Miller is Caucasian and Max is of Nigerian descent. Ezeh's tenure at FMC ended in September 2009. The parties disagree on the events that led to her departure.

---

[1] Unless otherwise noted, the following facts are taken from the Amended Complaint, depositions, and affidavits in the record.

## A.  Ezeh's Allegations

According to Ezeh, Miller held a bias against African-Americans, particularly those originating from African nations. Due to her bias, Miller allegedly sought to remove African subordinates from FMC by treating non-African employees favorably and discriminatorily instituting disciplinary actions.

Ezeh and former FMC CM Rashidat Taiwo ("Taiwo") claim that Miller openly discriminated against FMC's African employees. According to Taiwo, it was widely known throughout the company that Miller wanted to terminate African employees. Taiwo testified that during a CM meeting at FMC's Bestgate Clinic, Miller was so condescending and disrespectful to the participants that at least one CM began to cry. According to Taiwo, all of the CMs in that meeting were African-American. Miller also allegedly commented about the accents and mannerisms of African CMs during staff meetings. According to Ezeh, Miller would characterize the presentations of African CMs as "animated" while complimenting the presentations of their Caucasian counterparts. Taiwo testified that Miller stated she could not understand African employees' accents, directed them to "speak English," and stated it was as if they "never learned English." Taiwo also testified that Miller often called the African PCTs "stupid" and once told her that Max was "dumb."

According to Taiwo, Miller often made inappropriate facial and hand gestures behind African employees' backs, including "strangling" gestures. Taiwo also testified that Miller "pit" African employees against each other to make them quit. This allegedly included a method of placing African nurses on the floor to frustrate them to the point of quitting. Miller also allegedly allowed Caucasian employees with poor performance records to transfer, while terminating employees of other origins for comparable behavior. Taiwo testified that Miller told her the clinic was short-staffed because the African employees did not pass the requisite exams.

Ezeh avers that one of Miller's first instances of wrongful conduct against her specifically arose on January 29, 2009. That day, the water system malfunctioned at the Rosedale Clinic, which precluded the clinic from treating patients (the "water crisis"). That morning, Ezeh was out tending to a tooth ache and attempted to instruct the charge nurse, Sue Barton ("Barton"), on how to handle the situation. Upon hearing of the water crisis, Max instructed Ezeh to report to the clinic, but Ezeh did not do so until after her dental appointment. As a result of this incident, Max issued Ezeh a written reprimand and counseled her. According to Ezeh, Miller encouraged Max to issue the reprimand.

Ezeh also avers that Miller verbally counseled and harassed her for issuing a written reprimand to Barton, a Caucasian nurse, who allegedly twice directed a PCT to inject her with the drug Phenergan without authorization. Miller allegedly removed the written reprimand from Barton's file.

Miller also allegedly instructed Ezeh to report to work at 10:00 a.m. every morning while allowing her Caucasian counterparts to enjoy flexible schedules. Ezeh also alleges that Miller treated Caucasian CMs more favorably by failing to issue a written reprimand when another CM called out sick, without a doctor's note, and by attempting to have her work short-handed several staff, while assisting a Caucasian CM who was only short one staff member.

### B.  FMC's Allegations

According to FMC, Ezeh was an ineffective manager whose problems primarily stemmed from Ezeh's strained relationship with her subordinates. Max testified that Ezeh's employees complained that she was disrespectful and perpetuated a general lack of communication. This lack of communication allegedly included Ezeh's failure to inform her staff of changes regarding the schedule. According to Miller and Max, Ezeh's scheduling mishaps often resulted in an inability to keep her clinic fully staffed and prompted the expensive contracting of temporary staffing agencies. FMC discouraged agency usage because of the

cost and, in March 2009, required prior approval.  According to Max, Ezeh continued to use agency staff without approval.  Max testified that the staffing issues Ezeh encountered were not present prior to her arrival.  Max also stated that he counseled Ezeh several times regarding the various issues.

When questioned about the water crisis, Max testified that he issued the written reprimand to Ezeh without any coaxing from Miller.  According to Max, Ezeh reported directly to him at the time of the incident.  Max, Miller, and Susan Wilson ("Wilson")— FMC Regional Quality Manager—aver that Ezeh garnered low outcomes.  Finally, when asked about Miller's alleged discriminatory animus, Max testified that he had no knowledge of such conduct.  Max also testified that, on one occasion, Ezeh informed him of Miller's alleged statement regarding his intellect, but when he asked Miller and other meeting participants about the statement, everyone denied its existence.

Similarly, Miller testified that Ezeh had difficulty bringing her team together, which included a problem with accountability and attendance.  During her deposition, Miller recapitulated several of the aforementioned issues Max identified.  Miller also testified that Ezeh's clinic had a high turnover rate.  As for accountability, Miller testified that Ezeh failed to relieve her workers as promised and was not available for clinic issues as they arose.  Due to Ezeh's poor

performance, Miller and Max allegedly intended to execute a developmental action plan after a meeting scheduled for September 14, 2009.

Regarding the water crisis, Miller denied any involvement in the written reprimand. When asked about the Barton incident, Miller testified that she disagreed with the way Ezeh reported the situation, not the act of disciplining Barton. According to Miller, Ezeh failed to identify all of the salient facts when discussing the incident. Namely, that Dr. Al-Talib, Medical Director of the Rosedale Clinic, gave Barton permission to take the drug the first time.

Miller denied discriminating against FMC employees on the basis of race or national origin. Miller also denied telling Taiwo that Africans had issues passing the requisite exams. Miller, however, did admit to asking two employees whether they thought she discriminated against them when she heard those employees stated she was racist. According to Miller, the two employees allegedly denied making the statements.

C.    **Ezeh's Departure from FMC**

On September 14, 2009, Ezeh sent an e-mail to Gary Booth ("Booth"), Regional Vice President, and Wilson requesting "some intervention" to get control of her clinic. The e-mail also detailed Ezeh's grievances regarding Miller's behavior and stated that Miller's alleged treatment of her stemmed from

Ezeh's refusal to be a CM at her previous clinic, DaVita. In response, Wilson e-mailed Ezeh a copy of FMC's HR grievance policy.

That day, Ezeh attended a Control Quality Indicator ("CQI") meeting for the Rosedale Clinic. The CQI meeting participants included Miller, Dr. Al-Talib, Max, CM Kathy Lijewski, a nutritionist, and a social worker. Dr. Al-Talib began to discuss the staffing, scheduling, and employee morale issues at Ezeh's clinic and Max followed with staffing issues. According to FMC, Ezeh became upset during the discussion and began to yell and scream at Miller and Max. Moreover, FMC avers that Ezeh told Miller and Max that they could give the CM position to someone else, stated that she was "done," and proceeded to her office to clear personal belongings from her desk before departing from the building. According to Ezeh, she did not resign, but merely left the meeting to go home and take medication for her heart condition. Ezeh avers that several hours after the CQI meeting, she left a message for Max informing him that she would not be at work for the next two days. Max testified that he forwarded Ezeh's message to Miller.

Per Miller's request, Ezeh met with Max and Miller on September 17, 2009. During that meeting, Miller informed Ezeh that FMC accepted her resignation allegedly given during the September 14 meeting. Ezeh insisted that she did not resign,

but Miller remained steadfast in accepting the alleged resignation. Miller asked Ezeh whether she had any personal items in the office and, when Ezeh answered in the affirmative, Miller informed her that an FMC employee would mail the items.

On October 2, 2009, Ezeh filed a discrimination charge with the U.S. Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Dismissal and Notice of Right to Sue on August 31, 2011. Ezeh commenced this action against FMC on November 29, 2011 (ECF No. 1), and filed an Amended Complaint on January 9, 2012 (ECF No. 10). FMC filed a Motion to Dismiss Counts II and III or, in the alternative, for Partial Summary Judgment on March 12, 2012. (ECF No. 18). On August 8, 2012, the Court dismissed Count III. (ECF Nos. 34-35). After discovery, FMC filed the pending Motion for Summary Judgment.

## II.   STANDARD OF REVIEW

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A "material fact" is a fact that might affect the outcome of a party's case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001).

In ruling on this motion, the Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." <u>Masson v. New Yorker Magazine, Inc.</u>, 501 U.S. 496, 520 (1991) (citing <u>Anderson</u>, 477 U.S. at 255).

### III. DISCUSSION

### A. <u>Race & National Origin Discrimination (Count I)</u>

The Court finds summary judgment in favor of FMC to be appropriate on Ezeh's discrimination claim because she failed to raise a genuine issue of material fact that Miller's alleged discriminatory animus towards Africans had a direct bearing on her departure from FMC.

Under Title VII, an employer may not "discharge any individual, or otherwise [] discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove Title VII discrimination in two ways. First, under the mixed-motive framework, a plaintiff may present "direct or

circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision." Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005) (citation omitted).[2] This evidence must "bear directly on the contested employment decision." Volochayev v. Sebelius, No. 11-2229, 2013 WL 871193, at *3 (4th Cir. Mar. 11, 2013) (citing Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), abrogated on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003)). Second, a plaintiff may proceed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff, "after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." Diamond, 416 F.3d at 318 (citation omitted).

As a preliminary matter, one inquiry subject to each method of proof is whether Ezeh suffered an adverse employment action. The parties disagree on whether FMC terminated Ezeh or whether

---

[2] 42 U.S.C. § 2000e-2(m) provides: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race . . . or national origin was a motivating factor for any employment practice, even though the other factors also motivated the practice."

she resigned. The Court will not address this issue, however, because its resolution is not dispositive in this case.

### 1. Mixed-Motive Analysis

Ezeh avers that she is not required to proceed under the second method of proof because she has direct evidence of discrimination. Ezeh further avers that this evidence establishes the existence of genuine issues of material fact related to Miller's discriminatory conduct. The Court disagrees. Although Ezeh purports to offer direct evidence, much of the proffered evidence is circumstantial, and, although permissible, it nevertheless fails to establish that Miller's alleged discriminatory conduct had a direct bearing on Ezeh departure from FMC.

Ezeh's evidence includes: (1) a declaration from former CM Taiwo stating that Miller openly discriminated against African employees (Taiwo Decl. ¶ 3, ECF No. 51-8); (2) testimony from Taiwo that Miller was condescending and disrespectful to a group of African-American CMs during a meeting at FMC's Bestgate Clinic, which prompted at least one CM to cry (Taiwo Dep. 32:13-33:17, 36:22-37:15, 144:13-146:11, Sept. 24, 2012, ECF No. 47-25); (3) Miller's alleged statement to a Caucasian employee that "the Africans have got to go" (Am. Compl. ¶¶ 4, 25); (4) Ezeh and Taiwo's testimony that Miller often commented on the presentation skills and accents of African employees, including

statements that Miller couldn't understand them and it was as if the African employees "never learned English" (Ezeh Dep. 192:4-14, June 14, 2012, ECF No. 47-3; Taiwo Dep. 149:1-151:12; Taiwo Decl. ¶ 4); (5) Taiwo's testimony that Miller singled out African employees when discussing performance issues, often calling them stupid, and only spoke with her "favorite," non-African, employees when visiting Taiwo's clinic (Taiwo Dep. 93:7-94:2, 104:13-106:16); (6) Taiwo's testimony that Miller often made inappropriate facial and hand gestures behind African employees' backs, including "strangling" gestures (Taiwo Dep. 159:12-160:10; Taiwo Decl. ¶ 10)[3]; (7) Taiwo's declaration that Miller told her Max was "dumb" (Taiwo Decl. ¶ 11);[4] (8) Taiwo's

_____

[3] Ezeh's use of "often" and "only" in the pleadings appears to exaggerate the frequency of several of these occurrences. For example, Taiwo testified that there were "so many examples" of Miller making inappropriate facial and hand gestures (see Taiwo Dep. 106:18-22), but when asked for specific examples, she stated she only saw it once. (See id. 159:12-160:6). Moreover, Taiwo testified she was not sure whether Miller behaved the same way with non-African employees as she did not observe Miller's interactions with them. (See id. 107:13-18). Similarly, Taiwo testified that Miller _only_ spoke with non-African employees when visiting the clinics, but later testified that she did not see Miller speak with non-African employees "that often." (Id. 105:8-106:16).

[4] Ezeh's Opposition states that "Miller told Ezeh, Weaver, Taiwo, and Fuoud Chehade that Max was dumb." (Pl.'s Opp'n at 7). Although the declaration claims Miller told Taiwo that Max was "dumb," Taiwo testified that Miller did not use that exact word in conversation with her, but that she heard about this alleged statement through Chehade and Weaver, who also heard it from another CM. (Taiwo Dep. 109:4-22, 160:18-163:4). This statement is, therefore, hearsay and cannot be considered on a motion for summary judgment. Greensboro Prof'l Fire Fighters

testimony that Miller allowed Caucasian employees with poor performance records to transfer while terminating employees of other origins for comparable behavior (Taiwo Dep. 128:15-132:7; Taiwo Decl. ¶ 17); (9) Ezeh's testimony that Miller held her to stricter standards than her Caucasian counterparts, including work hours (Ezeh Dep. 141:4-147:22); (10) Taiwo's testimony that Miller "pit" African employees against one another to make them quit, which included a method of placing African nurses on the floor to frustrate them to the point of quitting (Taiwo Dep. 100-03, 110:19-111:6, 112:17-113:15, 115-16, 117:5-8, 120:19-121:3; Taiwo Decl. ¶¶ 8, 12-14); and (11) Taiwo's declaration that it was widely known throughout the company that Miller wanted to terminate African employees (Taiwo Decl. ¶ 9).

Of the proffered evidence, the only allegations to have a plausible direct bearing on Ezeh's departure from FMC are (1) Miller's alleged statement that "the Africans have got to go," (2) Miller's alleged transfer of Caucasian employees in lieu of the termination she would render to African employees in the same position, (3) testimony that Miller allegedly held Ezeh to stricter performance standards than her Caucasian counterparts, (4) Miller's alleged method of "pitting" African employees against each other, and (5) the alleged company-wide knowledge

_____

Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995); see also Bennett v. Kaiser Permanente, --- F.Supp.2d ---, 2013 WL 1149920, at *3 (D.Md. Mar. 20, 2013).

that Miller wanted to terminate African employees.  The Court will address the proffered evidence in turn.

First, Miller's alleged statement that "the Africans have got to go" is only cited in the Complaint (see Am. Compl. ¶¶ 4, 25), and is not corroborated by the record.  The statement is, therefore, hearsay evidence and barred from consideration in a motion for summary judgment.  City of Greensboro, 64 F.3d at 967.

Second, the alleged transfer of a Caucasian CM with low performance outcomes occurred after Ezeh departed, as she was Ezeh's replacement, and there is a dispute as to whether she left or was transferred.  Max testified that the CM left voluntarily for an unknown location.  (Max Dep. 109:14-19, June 15, 2012, ECF No. 47-4).  Conversely, Taiwo testified that Miller allowed the CM to transfer in lieu of being fired despite her low outcomes.  (Taiwo Dep. 129-31; Taiwo Decl. ¶ 17).  Irrespective of whether this CM left voluntarily or whether FMC transferred her, however, it occurred after Ezeh's departure and, therefore, has no direct bearing on her separation from FMC.  Furthermore, although both deponents referenced the Caucasian CM's low outcomes, neither mentioned that she garnered

complaints, or exhibited behavior in a meeting, similar to Ezeh.[5]
The record is also void of any evidence suggesting the same.

Third, Ezeh's allegations that Miller held her to stricter
standards than her Caucasian counterparts also fail to establish
a motivational link between Miller's alleged discriminatory
animus and Ezeh's departure. In support of this allegation,
Ezeh identified three CMs she believed were treated more
favorably. According to Ezeh, Miller did not reprimand the
first CM, K.L., for failing to come to work due to illness.
(See Ezeh Dep. 141:4-19). Ezeh admits, however, that K.L. was
not ill during a water crisis. (See Ezeh Dep. 144:2-5).
Moreover, the record shows that, as Ezeh's immediate supervisor
at the time, Max instituted the disciplinary action, not Miller.[6]
(See Miller Dep. 46:13-49:22, June 14, 2012, ECF No. 47-2; Ezeh
Dep. 141:20-143:10; Max Dep. 59:21-61:21). Miller allegedly
treated the second CM, M.L., differently than Ezeh by attempting
to allow Ezeh to work short of several staff while assisting
M.L. with her shortage although M.L. was only short one staff
member. (See Ezeh Dep. 144:6-147:11). Again, there is no

---

[5] The record also intimates that Miller permitted an African
employee to return to work after he submitted a letter of
resignation. (See Miller Dep. 100:12-102:9).

[6] Ezeh avers that Miller prompted Max to execute the
corrective action. (See Ezeh Dep. 141:20-143:10). Max denies
Miller had any involvement, and, even if she did influence Max
to proceed with the disciplinary measure, the incident took
place before Miller was Ezeh's supervisor.

indication of discriminatory animus in this action and no direct bearing on Ezeh's departure from FMC. Finally, Ezeh testified that Miller required her to arrive at 10:00 a.m., but allowed Caucasian CMs to enjoy flexible schedules. (Ezeh Dep. 147:12-22). Miller disputes this allegation. (Miller Dep. 45:3-20). Even after resolving this factual dispute in favor of Ezeh, there is no evidence that this restriction had a direct bearing on her departure.[7]

Fourth, Miller's alleged method of pitting African employees against each other by having them assign other African employees to the floor to frustrate them to the point of quitting is also insufficient. This allegation is based upon three incidents recounted by Taiwo. The first incident involves the transfer of Grace Mubang ("Mubang") from Taiwo's clinic. According to Taiwo, Miller labeled Mubang a "troublemaker" and told Taiwo to "get rid of her." (Taiwo Dep. 100-03). This

---

[7] Ezeh also avers that Miller discriminatorily instituted disciplinary actions when she caused Ezeh to be written up for the water crisis incident, but disciplined Ezeh for writing up Barton. (See Am. Compl. ¶ 6). The parties disagree as to whether Miller only requested that Ezeh present Barton's written disciplinary actions to Miller for approval, or if Miller outright forbade Ezeh to write up her employees. (See Ezeh Dep. 110; Miller Dep. 91). Even if Miller requested that Ezeh refrain from writing up employees, there is no evidence offered that this was based on racial motivations. Moreover, there is evidence in the record that Miller also requested that a Caucasian CM submit a written disciplinary note for approval. (See Def.'s Mot. Summ. J. Ex. 26, ECF No. 47-26). Finally, Barton is not a plausible comparator because she is a nurse with different job duties and responsibilities, not a CM.

incident fails to bear directly on Ezeh's departure from FMC because Mubang was ultimately transferred to another FMC clinic under Miller's supervision, not fired. (Taiwo Dep. 104:9-12). Moreover, Taiwo testified that she had no knowledge of the basis of Miller's alleged request. (Id.) The second incident involves an allegation that Miller told Taiwo to "place an older African nurse on the floor to frustrate [her] to the point of quitting." (Pl.'s Opp'n at 8). Taiwo's deposition, however, identifies the referenced nurse as Caucasian and, therefore, does not support the proposition. (See Taiwo Dep. 112:17-113:15). The final incident allegedly involves Miller directing Taiwo's nurse, Marianne, to instruct Taiwo to work the floor. (See Taiwo Decl. ¶ 14). Similar to the older nurse referenced above, however, Marianne is Caucasian, not of African descent. (Taiwo Dep. 117:5-8).

Finally, Taiwo declares that it was "widely known throughout the company that Miller wanted to terminate the workers of African origin." (Taiwo Decl. ¶ 9). The basis of this declaration is Taiwo's observation of Miller's "body language" and the allegation that she only spoke to non-African employees when visiting the clinics. (See Taiwo Dep. 104:13-106:16). Again, this evidence fails to raise an inference that national origin was a motivating factor in Ezeh's departure.

Taken as a whole, Ezeh's evidence is insufficient for a jury to reasonably conclude that race or national origin were motivating factors in Ezeh's departure. For the foregoing reasons, Ezeh has failed to offer sufficient evidence to survive a motion for summary judgment under the mixed-motive analysis.

## 2. Burden-Shifting Analysis

As previously mentioned, Ezeh did not engage in the burden-shifting analysis presented in McDonnell Douglas Corp. (See Pl.'s Opp'n at 18). That framework first requires Ezeh to establish a prima facie case of employment discrimination by showing that (1) she is in a protected class; (2) she suffered an adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. Bonds v. Leavitt, 629 F.3d 369, 386 (4th Cir. 2011) (citation and internal quotation marks omitted).

The record shows that Ezeh was not meeting FMC's legitimate expectations at the time of her departure. To the contrary, the record provides that Ezeh had difficulty managing her team and their schedules (see Miller Dep. 22:20-35:21, 42:8-46:12, 55:8-56:19, 64:14-65:1, 98:19-99:22; Max Dep. 28:14-41:20, 44:11-46:22, 67:9-69:15, 90:2-21, 114:15-115:18, 118:3-119:2; Schultz

Dep. 60:4-61:13, Nov. 2, 2012, ECF No. 47-10), produced low outcomes (see Miller Dep. 36:3-42:7; Max Dep. 112:10-113:8; Wilson Aff. ¶ 4, ECF No. 47-14; Developmental Action Plan ["DAP"], ECF No. 47-17), and yelled at her supervisors during the September 14, 2009 meeting before walking out (see Miller Dep. 65:7-13; Ezeh Dep. 186:17-187:16; Max Dep. 91:3, 92:7-94:22), among other things. The record also shows that Miller and Max intended to present Ezeh with a developmental action plan, outlining several of the aforementioned issues, after the September 14 meeting. (Miller Dep. 58:18-59:16; Max Dep. 117:13-18; DAP). Moreover, Ezeh does not refute FMC's evidence regarding her performance nor does she produce evidence regarding the level of her performance. Accordingly the Court finds that Ezeh would not be successful under the burden-shifting analysis presented in McDonnell Douglas Corp. because, at the time of her departure, she was not performing her job duties at a level that met FMC's legitimate expectations.

## B.  Retaliation (Count II)

Summary judgment is appropriate on Ezeh's retaliation claim because the record provides no causal link between her alleged protected activity and her departure from FMC.

Title VII prohibits an employer from "discriminat[ing] against any of [its] employees . . . because [the employee] opposed any practice made an unlawful employment practice by

this subchapter . . . ." 42 U.S.C. § 2000e-3(a).  The initial burden is on Ezeh to establish a prima facie case of retaliation under Title VII.  E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 405 (4th Cir. 2005).  This prima facie showing requires Ezeh to demonstrate that (1) she engaged in a protected activity; (2) FMC took an adverse employment action against her; and (3) the adverse employment action was causally connected to Ezeh's protected activity.  Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007).  Once Ezeh has met this initial burden, FMC can "defend itself by producing evidence of a legitimate, non-discriminatory reason for taking the adverse employment action."  Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2008) (citation and internal quotation marks omitted).

Ezeh fails to produce evidence that satisfies the causal element of the prima facie test.  In Count II Ezeh alleges that FMC retaliated against her by terminating her in response to the September 14, 2009 e-mail to Booth and Wilson.  Neither Miller nor Max were aware of Ezeh's e-mail at the time of her departure.  (See Wilson Aff. ¶ 7; Booth Aff. ¶ 4, ECF No. 47-18).  Therefore, there is no causal link between the September 14 e-mail and Ezeh's departure from FMC.  See, e.g., Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) (stating "the employer's knowledge that the

plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case"). Moreover, although Ezeh called FMC's human resources line to complain about the alleged discriminatory treatment, she did not do so until after her separation from FMC. (See Schultz Dep. 49:2-7).

Accordingly, FMC's Motion is granted as to Ezeh's retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS FMC's Motion for Summary Judgment. (ECF No. 47). A separate Order follows.


Entered this 1st day of May, 2013


_____/s/_____
George L. Russell, III
United States District Judge